**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION AT LAFAYETTE**

| | | |
|---|---|---|
| **WABASH NATIONAL, L.P.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Cause No. 4:06-cv-00135-AS** |
| | ) | |
| **VANGUARD NATIONAL,** | ) | |
| **TRAILER CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM, OPINION, AND ORDER**

**I.  BACKGROUND**

Unites States Patent Number 6,220,651 ("the '651 patent") and United States Patent Number 6,986,546 ("the '546 patent"), respectively the patents-in-suit, are utility patents relating to a sidewall of a trailer body.  The '651 patent and the '546 patent have identical patent specifications but differ as to their patent claims.  Wabash National, L.P. ("Wabash" or "plaintiff") is the assignee of both patents.

On October 20, 2006, Wabash filed a complaint against Vanguard National Trailer Corporation ("Vanguard" or "defendant") alleging infringement, of the patents-in-suit, in the United States District Court for the Northern District of Indiana.  This Court has jurisdiction over this action pursuant to 35 U.S.C. § 271 and 28 U.S.C. §§ 1331 and 1338(a).  Venue is proper based on 28 U.S.C. §§ 1391(b) & (c) and 1400(b).

The patents-in-suit generally relate to a joint configuration used for linking together composite panels composing a trailer body sidewall.  In total, the '651 patent includes eight (8) patent claims and the '546 patent includes twenty-six (26) patent claims.  Since patent claims

define the scope of an invention, it is no surprise that the parties to this suit derive particularly different constructions of some of the claims and terms included within the patent.  Wabash and Vanguard dispute the constructions of claims 1-5 and 7 of the '651 patent and claims 1 and 5 of the '546 patent.  Wabash and Vanguard disagree on eleven (11) specific constructions within the disputed claims of the '651 patent and five (5) specific constructions within the disputed claims of the '546 patent.

A pre-trial claims construction hearing, commonly referred to as a *Markman* hearing, was held before Judge Joseph Van Bokkelen on August 1, 2007 in Lafayette, Indiana.[1]   The purpose the hearing was to aid the court in construing the proper scope and meaning of the sixteen (16) disputed claim terms within the patents-in-suit.  Following the *Markman* hearing, and considering all relevant materials submitted by the parties, the Court has made an independent assessment of the disputed claims and now declares, as a matter of law, the meaning of those disputed claims.

## II.  DISCUSSION

Determining patent infringement requires determining whether an individual without authority, makes, uses, offers to sell, sells, or imports a patented invention within the United States, its territories, or its possessions, during the term of the patent.  35 U.S.C. §271(a).  A finding of infringement requires a two-step analytical approach.  First, the claims of the patent must be construed as a matter of law to determine their proper scope.  *Markman v. Westview*

---

[1] When this case was filed on October 20, 2006, it was originally assigned to Judge Allen Sharp.  The case remained on Judge Sharp's docket until October 16, 2007, when, due to Judge Sharp's unavailability, it was reassigned to Judge Joseph S. Van Bokkelen.  The case was reassigned back to Judge Sharp on April 4, 2008, pursuant to General Order No. 2007-20A.  Judge Van Bokkelen is no longer assigned to the case.

*Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995).  Second, a factual determination must be made as to whether the alleged infringing object(s), compared to the properly construed claims, infringes on the patent.  *Id.*  At this stage of the suit, the only duty of this Court is the first of these two steps, to construe the disputed claims of the patent.

## A.  THE LAW OF CLAIM CONSTRUCTION

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee [or patent assignee] is entitled the right to exclude."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citations omitted).  The purpose of construing the claims of a patent is to determine the meaning and scope of the patent that the plaintiff is asserting has been infringed.  *Markman,* 52 F.3d at 979.  Patent claim construction is the process of determining such meaning.  Claim construction is a matter of law exclusively for the court.  *Id.* at 977.

In determining the meaning of patent claims, courts are required to "discern the meaning of [a claim] term in the context of [the] invention and field of art."  *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1379 (Fed. Cir. 2006).  To accomplish this, the words of a claim "are generally given their ordinary and customary meaning."  *Phillips*, 415 F.3d at 1312 (citing *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  "The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  *Phillips*, 415 F.3d at 1313.  The focus of the Court, when it construes a disputed claim term, is not the subjective intent of the parties when they employed a certain term, but the objective test of what a person of ordinary skill in the art would have understood the claim to mean.  *Markman*, 52 F.3d at 986.  Therefore, "[c]laim construction is a fact-dependent,

3

invention-oriented exercise in logic and law." *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1322 (Fed. Cir. 2006).

Using logic and law to define the scope of the claims, as they appear in the patent, is controlling. Claim construction, therefore, begins and ends in all cases with the actual words of the claim. In most instances, "the ordinary meaning of claim language as understood by a person of skill in the art" is "readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. When a claim term cannot be easily discerned, the court should turn to "the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

Given the Federal Circuit's en banc opinion in *Phillips*, there is no question that intrinsic evidence is the most important source for informing the court when a claim term cannot be easily discerned. *V-Formation, Inc. v. Benetton Group SpA,* 401 F.3d 1307, 1310 (Fed. Cir. 2005). In *Phillips,* the Federal Circuit Court criticized the analytical methodology from *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), which had previously led the district courts to overly rely on extrinsic sources, such as dictionaries, treatises, and encyclopedias. The Federal Circuit Court expressed discontent with *Texas Digital's* instruction for the courts to begin claim construction analyses by consulting such extrinsic evidence to determine the ordinary and customary meaning of a term. Instead, the Court mandated in *Phillips* that substantial weight be given to the claims, the entire specification, and the prosecution history, if

4

in evidence.  The Court noted that "heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract" and asserted that district courts should give substantially less credence to such extrinsic sources.  *Phillips*, 415 F.3d at 1321.  To be clear, the intrinsic record consists of the claim language itself, the written description and drawings (i.e. the specification), and the prosecution history if it is in evidence.  While extrinsic evidence, such as general use dictionaries, "can shed useful light" on claims, such a source is still "less significant than the intrinsic record in determining the legally operative meaning of claim language."  *Phillips,* 415 F.3d at 1317.

Returning to canons of construction, the Court must presume that the terms in the claim mean what they say.  *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998); *see also Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1248 (Fed. Cir. 1998).  The entire claim must be interpreted in context, not as single elements in isolation.  The words used in the claims are interpreted in light of the intrinsic record evidence.  *Teleflex, Inc. v. Ficosa North America Grp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002).  Unless otherwise compelled, the court must give full effect to the ordinary and accustomed meaning of claim terms.  *Johnson Worldwide Assocs., Inc., v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999).  A patentee, however, may be his or her own lexicographer and use terms in a manner different from their ordinary meaning, and in those cases where the special definition differs from the meaning it would otherwise possess, the patentee's lexicography governs.  *Phillips*, 415 F.3d at 1316; *see also Abbott Labs v. Novopharm Ltd.*, 323 F.3d 1324, 1330 (Fed. Cir. 2003) (allowing the entry of a definition of a claim

term other than its ordinary and customary meaning where the patentee "has chosen to be his or her own lexicographer by clearly setting forth an explicit definition for a claim term").

The Court cannot read into a claim a limitation that appears in the specification but not in the claim itself. *Phillips*, 415 F.3d at 1323. "[T]he general principle is that limitations from the specification are not to be read into the claims." *Sjolund v. Musland*, 847 F.2d 1573, 1582 (Fed. Cir. 1988). Particularly, the Court should not limit the invention to the specific examples or preferred embodiments found in the specification. *Phillips*, 415 F.3d at 1323. The "repetition in the written description of a preferred aspect of a claimed invention does not limit the scope of an invention that is described in the claims in different and broader terms." *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1348 (Fed. Cir. 1998).

Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question. *See SciMed Life Systems v. Advanced Cardiovascular*, 242 F.3d 1337 (Fed. Cir. 2001). The court cannot interpret the meaning of a word found in a claim by adding an extraneous limitation found in the specification. *Id.* There is a fine line between reading a claim in light of the specification and reading a limitation from the specification. The Court must cautiously look to the specification for assistance in defining unclear terms instead of for assistance in limiting terms. *Comark*, 156 F.3d at 1186-87.

While intrinsic evidence is the primary evidence considered by a court in claim construction, extrinsic evidence may be consulted, as a last resource, to discern ambiguous claim language. *Phillips*, 415 F.3d at 1317. Courts may consult dictionaries or comparable sources to assist in

6

understanding the meaning of words and gain a better understanding of the disputed technology. *Phillips*, 415 F.3d at 1322. The intrinsic evidence, however, must take precedence when there is a conflicting definition. *Id.* If, after consulting extrinsic evidence, the claim is susceptible to "both a broader and narrower meaning, the narrower meaning should be chosen if it is the only one clearly supported by the intrinsic evidence." *Phillips*, 415 F.3d at 1317-19 (discussing the proper use of extrinsic evidence).

The *Phillips* Court stated that validity, at best, should be a very small consideration in claim construction. The Court stated, "[w]hile we have acknowledged the maxim that claims should be construed to preserve their validity, we have not applied that principle broadly, and have certainly not endorsed a regime in which validity analysis is a regular component of claim construction." *Phillips*, 415 F.3d at 1327. As such, validity should only be considered when "after applying all the available tools of claim construction . . . the claim is still ambiguous." *Phillips*, 415 F.3d at 1327.

Lastly, "[n]o matter how great the temptations of fairness or policy making, courts do not rework claims." *Max Daetwyler Corp. v. Input Graphics, Inc.*, 583 F. Supp. 446, 451 (E.D. Pa. 1984). "Courts can neither broaden nor narrow the claims to give [a party] something different than what [was] set forth" in the patent. *Id.* The duty of a judge is to determine the meaning of the claims at issue. In the exercise of that duty, the judge has an independent obligation to determine the meaning of the claims, notwithstanding the views asserted by the adverse parties. *Exxon Chem. Patents v. Lubrizol Corp.*, 64 F.3d 1553, 1554 (Fed. Cir. 1995). A judge must independently assess the claims, the specification, the prosecution history, and, if necessary, relevant extrinsic evidence, and declare the meaning of the claims.

## B.  CLAIM CONSTRUCTION

Applying the above standards, the Court will undertake the claim construction in this case.

### 1.  THE '651 PATENT

#### a.  Claim 1

*Disputed Claim Language for claim 1 of the '651 patent*

A joint between side panels . . . comprising:  a pair of panels . . . a logistics plate
member . . . and a splicing member . . . said splicing member having a top and a
bottom, a top portion proximate to said top of said splicing member being generally flat, a
bottom portion proximate to said bottom of said splicing member being generally flat, and an
intermediate portion which bulges outwardly between said flat top portion and said flat bottom
portion.  '651 patent, col. 14, ll. 43-62 (emphasis added for disputed claim language).

*Court's Claim Construction and Analysis for claim 1 of the '651 patent*

The Court construes the disputed language of claim 1 of the '651 patent as *"a portion of
the splicing member near or adjacent to the top edge of the splicing member is generally flat and
a portion of the splicing member near or adjacent to the bottom edge of the splicing member is
generally flat."*  This construction is proper given the plain discernable language of claim 1.  As
stated previously, claim construction begins and ends in all cases with the actual words of the
claim.  *AbTox, Inc.*, 122 F.3d at 1023.  "[T]he language of the claim frames and ultimately
resolves all issues of claim interpretation."  *Id.*

The plain language of claim 1 of the '651 patent provides that the top and bottom portions
of the splicing member be "generally" flat.  '651 patent, col. 14, ll. 57-60.  The claim language is
straightforward as to the "top" and "bottom" portions of the splicing member being flat in their
facilitation of the panel connections with the degree of the flatness modified by the word
"generally."  The language of claim 1 informs any reader that a bulge, the intermediate portion,

8

lay between these top and bottom sections and thus the clear delineation of what is a "top" and

what is a "bottom" is evinced in the claim language itself.  The specification supports this

construction as it notes that "[t]he flat top portion . . . and the flat bottom portion . . . of the

splicing member . . . facilitate connection of the panels . . . to the top and bottom rails."  '651

patent, col. 12, ll. 15-18.

On the other hand, Vanguard's proposed claim 1 construction is without support in either

the claim language or the specification language.  In *Wenger Mfg., Inc. v. Coating Mach. Sys.,*

*Inc.,* 239 F.3d 1225 (Fed. Cir. 2001), the Federal Circuit Court explained that "claims must be

read in light of the specification of which they are a part" and "it is improper to read limitations

from the written description into a claim."  In this case, Vanguard cannot even find its desired

limitation within the specification language let alone the claim language.

Vanguard unnecessarily seeks to import the limitation of the splicing member to be

"substantially" flat in both its top and bottom portions as opposed to "generally" flat as provided

for in the claim language.  Yet, as Wabash correctly indicates in its Reply Brief on Claim

Construction, Vanguard finds no textual support for its contention that "generally flat," as written

in claim 1, should be construed as "substantially flat."  (Pl.'s  Reply Br. 3).  Nowhere in the

claims or the specification can one find the adjectival syntax "substantially" to describe the

flatness of the top and bottom portions of the splicing member.  It is improper to imply that the

drawings of the embodiment create such a limitation when the actual claim language and

specification language is clear as to the degree of flatness being "generally."  While Vanguard

argues, at length, over the proper construction of the confused terms "top" and "end" portions,

given the specification, its conclusion that the top and bottom portions, as described in claim 1 of the '651 patent, be "substantially" flat, is non sequitur.

**b.  Claim 2**

*Disputed Claim Language for claim 2 of the '651 patent*

> A joint between side panels . . . comprising:  a pair of panels, . . . *each said panel having at least one end being stepped to define a stepped end section,* . . . a logistics plate member . . . and a splicing member . . . *said splicing member being seated against said stepped end sections.*  '651 patent, col. 14, l. 63 – col. 15, l. 11. (emphasis added for disputed claim language).

*Court's Claim Construction and Analysis for claim 2 of the '651 patent*

The disputed claim language of claim 2 requires the construction of two claim limitations: 1) "a stepped end section" of a panel and 2) "said splicing member being seated against said stepped end sections."  The Court will construe them in turn.

First, the Court construes "a stepped end section" of a panel as *"each said panel has an area of reduced thickness starting at one edge thereof and extending some distance toward the intermediate section of the panel."*

To begin with, the parties vehemently disagree over the proper construction of the word "stepped" as used in the limitation "stepped end section."  Wabash argues that the terms "coined" and "stepped down" are used synonymously throughout the specification to indicate panel areas of reduced thickness.  (Pl.'s  Reply Br. 5).  Moreover, Wabash argues that a "stepped end section" encompasses the word "groove" even though the word "groove" is used distinctly and separately in other claims (i.e. claims 4 and 5 of the '651 patent).  While this discussion somewhat anticipates the construction of the disputed limitations in claims 4 and 5 of the '651 patent, the discussion here, nonetheless, advances the understanding of the limitation "stepped end section."

Vanguard correctly argues that "different words or phrases used in separate claims are presumed to indicate that the claims have different meaning and scope." *Anderson v. Fiber Composites*, 474 F.3d 1361, 1369 (Fed. Cir. 2007).  In this case, different claims use both the terms "stepped" and "grooves" to describe different limitations.  Consequently, the different words are presumed to indicate that the claim limitations have different meaning and therefore the terms "stepped" and "grooves" must have different meaning and scope.

The specification language infers that coining is the process of squeezing or compressing the panels to achieve reduced thickness areas such as the "stepped end section" of claim 2.  '651 patent, col. 6, ll. 7-16.  The specification language also indicates that grooves may be formed by coining. '651 patent, col. 13, ll. 51-54.   Hence, coining is understood as the process used to achieve the reduced panel thickness that creates either a "stepped end section" or a "groove."  Since the terms "stepped" and "groove" are used differently throughout the claims of the '651 patent, they must be provided non-synonymous definitions.   In other words, "stepped end section" must be distinguishable from a "groove" even if the process of achieving these reduced thickness areas – coining – is the same process.

Next, the Court must define what entails a "stepped end section."  Since it is unclear from the claim language what is meant by "at least one end being stepped," the Court begins its analysis with the patent specification, which states as follows:

> Each end of the outer skins 250a, 250b of each panel 242a, 242b have an end section 263a, 263b (only one of which is shown on each panel 242a, 242b) which is coined or stepped down with an intermediate section 265a, 265b of each panel 242a, 242b remaining planar. . . . When the end section 263a, 263b of each outer skin 250a, 250b is coined, the core member 246a, 246b is squeezed or compressed between the skins 248a, 250; 248b, 250b . . . .

11

One logical inference from this quoted specification language is that each panel can be notionally divided into three sections:  two end sections on either side of an intermediate section.

The actual claim language describes that "each said panel [has] at least one end being stepped."  The claim language does not claim that the "end section" is stepped, but instead claims that the "end" is "stepped" to form or define a "stepped end section."  Thus, a "stepped end section" can be differentiated from an "end section" or an "intermediate section" as discussed in the patent specification.

The "stepped end section" defines the area within the "end section" that is stepped or, as described above, reduced in thickness.  Also, the "stepped end section" must begin at the end and extend some distance toward the intermediate section of the panel because the specification language clearly indicates that the intermediate section remains "planar" or, in other words, in the same plane as the panel existed before the coining.  Since the "stepped end section" must begin at the edge of the "end section," the distinction between a "stepped end section" and a "groove" becomes clearer. As evidenced in the embodiment of Figure 16 of the '651 patent, no limitation exists as to require a groove to start at the edge of any section of a panel, but the limitation does exist for a "stepped end section."

Second, the Court construes the limitation "said splicing member being seated against said stepped end sections" as *"the splicing member has portions lying against the stepped end section."*  This construction is proper given the plain discernable language of claim 2.  The purpose of creating a "stepped end section" is to prepare the panel for the contacting splicing member.  Vanguard cannot find its desired limitation within the claim language and little ambiguity surrounds this limitation.  Vanguard unnecessarily seeks to import the limitation of the

12

splicing member to be "flush" with the intermediate section of a panel that has remained planar following the coining.  (Def.'s Claim Construction Br. 8).  Yet, the claim language provides for no such limitation.  While a "flush" fit may ultimately be the desired reason for creating a "stepped end section," the claim language is broad and cannot be limited to such a construction. As previously noted, the "written description of a preferred aspect of a claimed invention does not limit the scope of an invention that is described in the claims in different and broader terms." *Laitram Corp.*, 163 F.3d at 1348 (Fed. Cir. 1998).

**c.  Claim 3**

*Disputed Claim Language for claim 3 of the '651 patent*

> A joint between side panels . . . comprising:  a pair of panels, . . . *each said panel having at least one end being stepped to define a stepped end section*, . . ., a logistics plate member . . ., *said logistics plate member being seated against said stepped end sections* and *joining means associated with said outer skins for joining said outer skins together.*  '651 patent, col. 15, ll. 12-27 (emphasis added for disputed claim language).

*Court's Claim Construction and Analysis for claim 3 of the '651 patent*

The disputed claim language of claim 3 requires the construction of three claim limitations: 1) "a stepped end section" of a panel; 2) "said logistics plate member being seated against said stepped end sections"; and 3) "joining means associated with said outer skins for joining said outer skins together."  The Court will construe them in turn.

First, both parties assert that the "stepped end section" limitation in claim 3 of the '651 patent should be construed identically to the construction in claim 2 of the '651 patent.  Therefore, the Court construes the limitation "a stepped end section," for the purposes of claim 3 of the '651 patent, as *"each said panel has an area of reduced thickness starting at one edge thereof and extending*

13

*some distance toward the intermediate section of the panel."*   The reasoning and rationale for this construction can be found in the foregoing discussion of claim 2 of the '651 patent.

Second, both parties assert that the limitation of "said logistics plate member being seated against said stepped end sections" should be construed in the same manner as the limitation in claim 2, except that the term "logistics plate" should be used instead of "splicing." Therefore, the Court construes the limitation "said logistics plate member being seated against said stepped end sections" as *"the logistics plate member has portions lying against the stepped end section."*   The reasoning and rationale for this construction can be found in the foregoing discussion of claim 2 of the '651 patent.

Third, the parties agree that the "joining means" limitation of claim 3 of the '651 patent is written in means-plus-function form under 35 U.S.C. § 112 ¶ 6. "Application of § 112 ¶ 6 requires identification of the structure in the specification which performs the recited function." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1257 (Fed. Cir. 1999)   Therefore, construction of a means-plus-function claim includes two steps. The first step is to determine the function of the limitation. *Id.* at 1258 (Fed. Cir. 1999).   After identifying the function of the limitation, the second step is to determine the structure corresponding to the previously identified function. *Id.*

As to the first step of this means-plus-function analysis, the parties agree that the function performed by the "joining means" is "joining said outer skins [of the panels] together." (Pl.'s Reply Br. 10).   The parties' dispute focuses on the second step of the analysis – identifying the structure that corresponds to the agreed upon function of joining the outer skins of the panels together. The test for identifying the structure requires an examination of the specification to determine what is

necessary to perform the claimed function. *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1375 (Fed. Cir. 2003). The specification or prosecution history must clearly link the function to the structure necessary for achieving such function. *Id.*

The Court construes the limitation "joining means" as *"the splicing member and fasteners"* associated with said outer skins for joining said outer skins together. As cited by Wabash, "[a] court may not import into the claim features that are unnecessary to perform the claimed function." *Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1352 (Fed. Cir. 2003). Thus, features that do not affect the function cannot limit the structure achieving the function. In this case, Vanguard seeks to define the structure for achieving the function in very precise means with very descriptive adjectival syntax as derived from the specification. Nonetheless, the only corresponding structure for the joining means is the splicing member and its associated fasteners. Even to the lay judge it is clear that the claim language is definitively referring to the splicing member as understand in the claim language and specification.

**d. Claim 4**

*Disputed Claim Language for claim 4 of the '651 patent*

> A joint between side panels . . . comprising: a pair of panels, . . . a logistics plate member . . . *said logistics plate member having an inner surface, a flat intermediate portion and opposite edges extending directly from said intermediate portion,* said flat intermediate portion being positioned alongside each said panel, said inner surface of said logistics plate member being positioned in a different plane than said inner surface of each said panel, *said opposite edges being curved, said inner surfaces of said panels having grooves formed therein in which said opposite curved edges are seated,* . . . and joining means associated with said outer skins for joining said outer skins together. '651 patent, col. 15, ll. 28-51 (emphasis added for disputed claim language).

*Court's Claim Construction and Analysis for claim 4 of the '651 patent*

The disputed claim language of claim 4 requires the construction of three claim limitations: 1) "said logistics plate member having an inner surface, a flat intermediate portion and opposite edges extending directly from said intermediate portion"; 2) "said opposite edges being curved"; and 3) "said inner surfaces . . . having grooves formed therein in which said opposite curved edges are seated." The Court will construe them in turn.

First, the Court finds that the claim language "said logistics plate member having an inner surface, a flat intermediate portion and opposite edges extending directly from said intermediate portion" does not require a construction beyond its plain and ordinary meaning. Any person of ordinary skill in the art will understand the term "flat" to mean without slope. This is obvious and discernable to even a lay judge, unskilled in the art, from the claim language itself. The edges thus extend in opposite edges from this flat portion.

As to this claim language, both parties seek to import a host of broadening and narrowing limitations that are unnecessary. Wabash seeks to describe "flat" as "planar." (Pl.'s Reply Br. 13). Yet, planar implies a dimensional aspect that is unnecessary when the word "flat" simply conveys the correct and ordinary meaning of what the patent seeks to limit. Vanguard, on the other hand, seeks to describe "flat" as "without marked projections or depressions" and that "it does not bulge or sink at any point." (Def.'s Claim Construction Br. 19). Vanguard's sought construction is confusing because it construes in the negative. Vanguard's construction construes what does not exist in the claim limitation, but seems to begin from the premise that the intermediate portion is flat. If flat is understood, then any further limitation not written in the claim language is unnecessary.

Second, the Court construes the limitation "said opposite edges being curved" as *"the opposite edges are bent from the flat position*." Again, any person of ordinary skill in the art will

16

understand that the word "curve" means a rounded bend in a piece of metal that is flat in its intermediate portion. Even assuming that a scintilla of doubt exists in the mind of the person of ordinary skill as to the word "curve," the patent specification unmistakably indicates the desired limitation. The specification describes the bent edges 1080a and 1080b in Figure 16 of the '651 patent as: "The logistics plate 1052 acts like a post and is a member having a flat intermediate portion 1078 with opposite edges 1080a, 1080b which are rolled." '651 patent, col. 13, ll. 55-59. To roll a flat piece of metal is easily understood to bend the edges of that piece of metal. Claim construction begins and ends in all cases with the actual words of the claim, which is facially clear as to this claim limitation.

Third, the Court construes the limitation "said inner surfaces . . . having grooves formed therein in which said opposite curved edges are seated" as "*said inner surfaces of the panels having reduced thickness areas in which the curved edges of the logistics plate lay.*" The discussion of claim 2 of the '651 patent makes this clear and provides for a consistent construction.

The Court, in discussing "stepped end sections" in claim 2 supra, also dealt with the coining process of squeezing or compressing the panels to achieve reduced thickness areas that eventually become either "stepped end sections" or "grooves." Grooves, as understood from the patent specification discussion in claim 2, are general reduced thickness areas as distinguished from a "stepped end section" that has a specific locational boundary. As to the "curved edges" of the logistics plate being "seated" in the grooves, such a construction has already been provided in the claim 2 discussion. Once again, seated means lying against the reduced thickness area as understood by the patent specification.

**e. Claim 5**

*Disputed Claim Language for claim 5 of the '651 patent*

> A joint as defined in claim 4, *wherein said grooves are formed by coining said inner skins.*  651 patent, col. 15, ll. 52-53 (emphasis added for disputed claim language).

*Court's Claim Construction and Analysis for claim 5 of the '651 patent*

Given the foregoing discussions in claims 2 and 4 of the '651 patent, the Court construes the disputed language of claim 5 as "*forming an area of reduced thickness by applying pressure to the panel skin.*"  This construction maintains the consistency between the previously construed claims and represents the ordinary and customary meaning of the claim language as understood from the specification.

**f. Claim 7**

*Disputed Claim Language for claim 7 of the '651 patent*

> A joint between side panels . . . comprising:  a pair of panels, . . . *each said panel having at least one end being stepped to define a stepped end section*, . . . a logistics plate member . . . *said logistics plate member . . . is seated against said stepped end sections* and *joining means* associated with said outer skins for joining said outer skins together.  '651 patent, col. 16, ll. 21-38 (emphasis added for disputed claim language).

*Court's Claim Construction and Analysis for claim 7 of the '651 patent*

The disputed claim language of claim 7 requires the construction of three claim limitations: 1) "a stepped end section" of a panel; 2) "said logistics plate member being seated against said stepped end sections"; and 3) "joining means associated with said outer skins for joining said outer skins together."  The Court will construe them in turn.

First, both parties assert that the "stepped end section" limitation in claim 7 of the '651 patent should be construed identically to the constructions in claims 2 and 3 of the '651 patent.  Therefore,

18

the Court construes the limitation of "a stepped end section," for the purposes of claim 7 of the '651 patent, as *"each said panel has an area of reduced thickness starting at one edge thereof and extending some distance toward the intermediate section of the panel."* The reasoning and rationale for this construction can be found in the foregoing discussion of claim 2 of the '651 patent.

Second, both parties assert that the limitation of "said logistics plate member being seated against said stepped end sections" should be construed in the same manner as the limitation in claim 3 of the '651 patent. Therefore, the Court construes the limitation "said logistics plate member being seated against said stepped end sections" as *"the logistics plate member has portions lying against the stepped end section."* The reasoning and rationale for this construction can be found in the foregoing discussion of claims 2 and 3 of the '651 patent.

Third, both parties assert that the limitation of "joining means" should be construed in the same manner as the limitation in claim 3 of the '651 patent. Therefore, the Court construes the limitation as *"the logistics plate and fasteners."* The reasoning and rationale for this construction can be found in the foregoing discussion of claim 3 of the '651 patent.

## 2.  THE '546 PATENT

As stated in Wabash's Brief:

The '546 patent . . . is a continuation application from Application No. 10/120,096 which was abandoned, which in turn was a continuation application from the application that issued as U.S. Patent No. 6,412,854 which was a divisional application from the application that issued as the '651 patent. The '546 Patent has the same disclosure as the '651 Patent. Claims 1, 2, 5, 6, 9-12, and 17-21 are asserted in this case of which claims 1 and 5 are independent claims.

(Pl.'s  Br. 19)

19

**a. Claim 1**

*Disputed Claim Language for claim 1 of the '546 patent*

> A joint between side panels . . . comprising:  a pair of panels, . . . a *member* for joining said panels together and for spacing at least a portion of said panel ends apart from each other a predetermined distance; and a splicing member for joining said panels together, *said splicing member having a top and bottom, a first portion proximate to said top of said splicing member which is generally flat, and a second portion which bulges outwardly from said first portion and extends toward said bottom of said splicing member.*  '546 patent, col. 14, ll. 48-64 (emphasis added for disputed claim language).

*Court's Claim Construction and Analysis for claim 1 of the '546 patent*

The disputed claim language of claim 1 of the '546 patent requires the construction of two claim limitations:  1) "a member for joining said panels together and for spacing at least a portion of said panel ends apart from each other a predetermined distance" and 2) "said splicing member having, a top and a bottom, a first portion proximate to said top of said splicing member which is generally flat, and a second portion which bulges outwardly from said first portion and extends toward said bottom of said splicing member."  The Court will construe them in turn.

First, the word "member" as used in claim 1 of the '546 patent is construed as referring to the "*logistics plate*" as understood by the specification.  The entire claim must be interpreted in context, not as single elements in isolation.  Claim terms may be used to construe like terms in other claims.  *Phillips*, 415 F.3d at 1315.  Claims 7 and 8 of the '546 patent aid the contextual understanding of the term "member" as both claims use the term similarly.  The same language for the term "member" is recited in claim 8, which depends from claim 7, and recites that "said member is a logistics plate."  This context provides for a consistent understanding of the term "member."

20

If the term member were to be construed in any other way, then the term would be inconsistently used throughout the claims of the patent.

Vanguard contends this limitation is written as a means-plus-function similar to that of claim 4 of the '651 patent. Nonetheless, Wabash's refutation of this point is directly on point. Wabash correctly cites *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002) for the proposition that "a claim term that does not use 'means' will trigger the rebuttable presumption that § 112 ¶ 6 does not apply." Vanguard does not sufficiently present evidence that claim 1 of the '546 patent overcomes the rebuttable presumption against a means-plus-function construction. Even if Vanguard had presented more evidence on this point, however, it is still clear to the Court that claim 1 of the '546 patent is still not a means-plus-function claim given the specification.

Second, the Court construes the disputed language, "said splicing member having, a top and a bottom, a first portion proximate to said top of said splicing member which is generally flat, and a second portion which bulges outwardly from said first portion and extends toward said bottom of said splicing member" as "*a portion of the splicing member near or adjacent to the top edge of the splicing member is generally flat and a portion of the splicing, not in the top portion, contains a bulge extending toward the bottom edge of the splicing member.*" Just as the claim language of claim 1 of the '651 patent was clear that the "top" and "bottom" portions of the splicing member were flat, so too is claim 1 of the '546 patent clear that the bottom portion does not need to be flat and may be bulged. Plaintiff, in its prosecution history, explains this fully: "As independent claims 15, 17, 19 and 21 require that only a portion of the splicing member be provided with the bulge, such that the bulge does not extend along the entire height thereof, from the top rail to the bottom rail." (Pl.'s Reply Br. 21) (citations omitted). The objective intent of the patentee was to provide for a

21

bulge extending from the top to the bottom without a further limitation of the bottom being flat as in claim 1 of the '651 patent.  The construction of the term thus follows the objective understanding as provided for by the claim language itself and the prosecution history.

**b.  Claim 5**

*Disputed Claim Language for claim 5 of the '546 patent*

> A trailer body comprising:  a top; a floor; side walls, each said side wall comprised of at least a pair of panels, . . . *top rails connecting each said side wall and said top*; bottom rails connecting each said side wall and said floor; a *member* for joining said panels together and for spacing at least a portion of said panels ends apart from each other a predetermined distance; and a splicing member for joining said panels together, *said splicing member having a top and a bottom, a first portion proximate to said top of said splicing member which is generally flat,* said first portion *facilitating attachment* of said splicing member to said top rails, and *a second portion which bulges outwardly from said first portion and extends toward said bottom of said splicing member.*  '546 patent, col. 15, ll. 21-43 (emphasis added for disputed claim language).

*Court's Claim Construction and Analysis for claim 5 of the '546 patent*

The disputed claim language of claim 4 of the '546 patent requires the construction of four claim limitations:  1) "top rails connecting each said side wall and said top";  2) "a member for joining said panels together and for spacing at least a portion of said panels ends apart from each other a predetermined distance"; 3) "said splicing member having a top and a bottom, a first portion proximate to said top of said splicing member which is generally flat"; and 4) "from said first portion and extends toward said bottom of said splicing member."  The Court will construe them in turn.

First, the court construes the disputed limitation "top rails connecting each said side wall and said top" as "*rails which connect side walls to the top of the trailer body.*"  Vanguard argues that since the term "rails" is plural this Court should construe that multiple top rails are necessary for connecting each side wall and top.  While it is good form for Vanguard to act as a zealous advocate

22

of its client's interests, such a construction is a stretch to say the least.  Figure 14 of the '546 patent

depicts an embodiment and the patent specification states:

> In order to connect the sidewalls 24a to the roof 30a, the roof 30a is laid on top of the
> edges of the sidewalls 24a. Each top rail 38a is connected by seating the first portion
> 39a against the roof 30a and the second portion 41a against the respective sidewalls
> 24a. The second portion 41a of each top rail 38a sits over the flat top portion 970 of
> each splicing member 954 provided along the length of the respective sidewalls 24a.

There exists no evidence in the specification or the prosecution history that the claim language

means that multiple rails exist for connection.  The plurality of the word "rail," as used in claim 5,

is clearly a reference to the function of each rail on the trailer (i.e. the rails of trailer in total) serving

the purpose as stated in the claim language.  Wabash is correct in stating that Vanguard's reading

of claim 5 would "read[] out every embodiment disclosed in the specification." (Pl.'s Reply Br. 23).

Again, a stretch to say the least.

Second, the court construes the disputed limitation "a member for joining said panels

together and for spacing at least a portion of said panels ends apart from each other a predetermined

distance" as referring to the "*logistics plate*" as understood by the specification.  The reasoning and

rationale for this construction can be found in the foregoing discussion of claim 1 of the '546 patent.

Third, the court construes the disputed limitations "said splicing member having a top and

a bottom, a first portion proximate to said top of said splicing member which is generally flat" and

"and a second portion which bulges outwardly from said first portion and extends toward said

bottom of said splicing member" as *"a portion of the splicing member near or adjacent to the top

edge of the splicing member is generally flat and a portion of the splicing, not in the top portion,*

contains a bulge extending toward the bottom edge of the splicing member." The reasoning and rationale for this construction can be found in the foregoing discussion of claim 1 of the '546 patent.

Fourth, the court construes the disputed limitation "facilitating attachment" as "*the portion of the splicing member near or adjacent to the top edge of the splicing member is generally flat and makes attachment of the splicing member and the top rail easier*." As to this claim construction, the parties return to their earlier dispute of the meaning of the term "rails." Given the first construction under this claim 5 of the '546 patent, there appears no disagree between the parties as to that point. Thus, the reasoning and rationale for this construction can be found in the foregoing discussion of claim 1 of the '546 patent.

## III.  CONCLUSION

Claim terms in the '651 patent and the '546 patent are to be construed in accordance with the foregoing.

**SO ORDERED on May 2, 2008.**


_____/s/ ALLEN SHARP_____
**ALLEN SHARP, JUDGE**
**UNITED STATES DISTRICT COURT**